IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

EMILY S. HALE                                                                                           PLAINTIFF

        V.                    Civil No. 2:22-cv-02078-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                                                   DEFENDANT

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Emily Hale, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423(d)(1)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.    Procedural Background

Plaintiff protectively filed her application for DIB on March 21, 2018.[1], alleging disability since December 7, 2016[2], due to epilepsy, knee problems, memory problems, fibromyalgia, and arthritis.  (ECF No. 17, pp. 110, 127, 244-250, 280).  The Commissioner denied her applications initially and on reconsideration, and an administrative hearing was held on March 11, 2020, with a supplemental hearing held on November 5, 2020, to take testimony from a vocational expert.  (*Id*. at 48-78).  The Plaintiff was present for the hearing and represented by counsel.

---

[1] Plaintiff filed prior applications for DIB and SSI on May 19, 2015, resulting in a final unfavorable administrative decision on December 16, 2016, by ALJ Edward Starr.  (ECF No. 17, pp. 82-93).
[2] Onset date amended from April 29, 2013, to December 7, 2016, due to the prior denial of benefits.  (ECF No. 17, p. 23).

On her alleged onset date, Plaintiff was 31 years old and possessed a high school education with one year of college. (ECF No. 17, pp. 62). She had past relevant work ("PRW") experience as a certified nurse aide. (*Id*. at 62, 281).

On January 20, 2021, Administrative Law Judge ("ALJ") Bill Jones issued an unfavorable decision, noting that the Plaintiff's date last insured ("DLI") was September 30, 2018. (ECF No. 17, p. 26). During the relevant period, he concluded that her osteoarthritis ("OA") of the left shoulder; disorders of the left knee, neck, and back; seizures; gastroesophageal reflux disorder ("GERD"); hepatitis C; migraines; rheumatoid arthritis; and mood disorder were severe, but that she did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF No. 17, p. 26). Despite her impairments, ALJ Jones determined she retained the residual functional capacity ("RFC") to perform sedentary work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling; less than moderate exposure to fumes, odors, dusts, gases, and poor ventilation; and no exposure to hazards. (*Id*. at 32). From a mental standpoint, he also found the Plaintiff to be capable of simple, routine, and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes and no more than incidental contact with co-workers, supervisors, and the public. With the assistance of a vocational expert ("VE"), the ALJ ultimately decided the Plaintiff could perform work as a nut sorter, addresser, and copy examiner. (*Id*. at 38).

On March 14, 2022, the Appeals Council denied Plaintiff's request for review (ECF No. 17, pp. 7-12), and she subsequently filed her Complaint to initiate this action. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 19, 20), and the matter is ripe for resolution. The case has been referred to the undersigned for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

3

gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of her RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III.   Discussion

Plaintiff has raised four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; (3) whether the ALJ properly assessed her subjective complaints; and (4), whether the ALJ's RFC determination is supported by substantial evidence. After reviewing the record in this case, we agree that the ALJ's physical RFC determination lacks substantial support in the record.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. The ALJ's RFC determination must be based on all relevant evidence in the record, including medical records, observations of treating physicians and others, limitations resulting from factors such as pain, and the claimant's own descriptions of her limitations. *Id*. § 404.1545(a)(3); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) and *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).

At the outset, we note that the relevant period in this case is limited to the period extending from December 17, 2016, Plaintiff's amended onset date, through September 30, 2018, her DLI. To fully understand the case, however, we believe that some background information is necessary. The Plaintiff has a history of a left chondral defect of the patella and lateral tibial plateau

necessitating arthroscopic chondroplasty procedures to the patella in May 2013 and August 2014, and an open medial patellofemoral ligament reconstruction with hamstring autograft in July 2015. (ECF No. 17, pp. 1250-1260). After suffering a fall in January 2016, her symptoms returned. (*Id*. at 395-397). An MRI conducted in June 2016 was consistent with an old complete tear of the medial patellofemoral ligament graft, full-thickness cartilage loss of the patellar apex and adjacent lateral patellar cartilage with subchondral cystic change, possible superficial fissuring of the trochlear cartilage, a chronic free edge radial tear and/or prior debridement of the posterior horn of the lateral meniscus, and patella alta. (*Id*. at 609-610, 100-1001).

She also had a history of Sjogren syndrome, for which she had been prescribed Plaquenil to no avail; seizures that were responsive to the medications prescribed, when she was compliant; fibromyalgia; and degenerative changes in the thoracic and cervical spine as well as the left shoulder. (ECF No. 17, pp. 398-405, 565-567, 569-570, 595-596, 1267-1270).

The record contains a medical source statement from the Plaintiff's primary care physician, Dr. Stephen Carney; a functional capacity evaluation; and RFC assessments from two agency physicians, some of which are dated after her DLI but are consistent with the overall evidence of record dated during the relevant period. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (finding that evidence dated outside the insured period can be used to help "to elucidate a medical condition during the time for which benefits might be rewarded."). The ALJ, however, found each of these to be unpersuasive to the extent they varied from his RFC findings.

In December 2016, advanced practical registered nurse Jessica Shepherd at Advanced Orthopaedic Specialists refilled Plaintiff's Hydrocodone, and she advised Plaintiff to transition to a patella stabilizing knee brace as tolerated. (ECF No. 17, pp. 893-899).

5

In February 2017, Dr. Carney treated the Plaintiff in follow-up of her right shoulder pain. (ECF No. 17, pp. 545-549).  He noted her prescriptions for Hydrocodone, Soma, and Valium.

The following month, Nurse Shepherd treated her for left knee pain.  (ECF No. 17, pp. 888-892).  She advised the Plaintiff to continue with her home exercise program and to wear her patella stabilizing brace when walking greater than 50 yards.  Nurse Shepherd opined that she should continue with a "sit down job only."

In April, the Plaintiff returned to Dr. Carney.  (ECF No. 17, pp. 542-545).  He noted her ability to ambulate normally with a normal gait and station, and prescribed Diazepam, Oxycodone, and Carisoprodol for diagnoses of anxiety, seizure disorder, and chronic pain.

Plaintiff advised orthopedist, Dr. Christopher Arnold, that her intermittent left knee pain was two on a 10-point scale on June 12, 2017.  (ECF No. 17, pp. 883-887).  She indicated that the pain improved with the use of pain medication, Ibuprofen, and rest.  Concluding she had reached maximum medical improvement, he released the Plaintiff to return to work with the following restrictions: she could not lift more than 20 pounds from waist level, 15 pounds from shoulder level, or 10 pounds overhead; push/pull more than 30 pounds; carry more than 20 pounds; or kneel, squat, crouch, crawl, climb stairs, stand for prolonged periods, or walk frequently.  (*Id*. at 1305).

The Plaintiff received treatment for her seizures on June 13, 2017.  (ECF No. 17, pp. 1262-1265).  She also complained of all over pain, which she rated as 7/10, and indicated it was worse in the mornings and late at night and aggravated by weather changes and overactivity.  Dr. Roy Sampson noted moderate diffuse tenderness to palpation in the shoulders, elbows, wrists, metacarpophalangeal joints, proximal interphalangeal joints, and distal interphalangeal joints with 18/18 fibromyalgia tender points.

On July 12, 2017, the Plaintiff complained of neck pain. (ECF No. 17, pp. 446-449, 1153-1188, 1193-1209, 1214-1215). An x-ray of her cervical spine revealed multilevel degenerative changes. The doctor diagnosed cervical radiculopathy and prescribed Prednisone.

At a follow-up with Dr. Carney, approximately two weeks later, she exhibited a normal mental status and a normal gait. (ECF No. 17, pp. 535-539). However, an MRI of her knee dated August 4, 2017, revealed early degenerative changes with grade I chondromalacia involving the articular surface of the left lateral tibial plateau. (ECF No. 17, p. 568).

Return visits to Dr. Carney in September and December 2017 revealed a normal gait and station and a normal mental status. (ECF No. 17, pp. 529-535). Further, during an October follow-up with Dr. Arnold, the Plaintiff complained of stiffness in her left knee, rating her pain as a 4/10. (*Id*. at 877-882). She was able to walk but continued to report difficulty climbing stairs, exercising, getting in and out of the car, kneeling, performing her activities of daily living, putting on her socks and shoes, and walking more than five blocks. On exam, the Plaintiff was fully oriented and in no acute distress with pain, stiffness, and a positive inhibition sign in the knee. X-rays were consistent with her medial patellofemoral ligament reconstruction surgery. Dr. Arnold diagnosed chondromalacia patellae with effusion and pain in the left knee and muscle wasting and atrophy in the left thigh. He indicated that she could benefit from cartilage restoration and should consider an osteochondral autograft transfer ("OATS") procedure on the patella with a tibial tubercle osteotomy ("TTO") in the future to improve alignment of the patella. Her pain medications (Oxycodone and Carisoprodol) were refilled.

On January 22, 2018, Plaintiff returned to Nurse Shepherd after "scratching at" her left leg. (ECF No. 17, pp. 675-686, 870-876, 997). She was concerned about an infection. A doppler ultrasound revealed no evidence of a blood clot in either leg, and a physical exam showed slightly

decreased flexion in the left knee (130/135 degrees), a limp, atrophy in the left quadriceps femoris, tenderness to the left patella, and a positive inhibition sign. The Plaintiff had opted to undergo the OATS procedure. Following a presurgical evaluation by Dr. Carney documenting a normal gait and station, Dr. Arnold performed the OATS procedure with TTO on February 9, 2018. (*Id*. at 525-528, 687, 689-705).

During a follow-up ten days later, the Plaintiff complained of shin tenderness and voiced concerns that she might be developing an infection. (ECF No. 17, pp. 864-869). X-rays showed good positioning of the TTO hardware. On February 26, 2018, her staples were removed, and PT was prescribed. (*Id*. at 859-863). Two weeks later, Dr. Arnold prescribed Augmentin for an active wound infection. (*Id*. at 853-858). Unfortunately, the infection progressed, resulting in the development of a small area of wound necrosis requiring left knee wound dehiscence on March 16, 2018. (*Id*. at 456-458, 707-745, 846-852).

On March 22, 2018, Nurse Shepherd performed an arthrocentesis. (ECF No. 17, pp. 760, 841-845, 1356-1358). Although the culture came back negative, her cell count was elevated. (*Id*. at 762-801, 834-841). Therefore, a PICC line was inserted to aid in the delivery of antibiotics. And, on March 26, 2018, Dr. Arnold performed arthroscopic irrigation and debridement of the wound. (*Id*.).

Two days later, an infectious disease specialist, Dr. Daniel Young, continued the Daptomycin. (*Id*. at 574-575). The Plaintiff had been doing well and walking but had a "wash out" on Monday and now felt the knee was tight. It was not warm to the touch, but Dr. Young did note effusion and tenderness. That same day, she reported significant pain when the knee was not elevated and indicated that wrapping the knee caused extreme heat. (ECF No. 17, pp. 828-834).

8

Nurse Shepherd advised her to resume her formal PT protocol, releasing her to perform a full range of motion as tolerated, and recommending ice and elevation frequently to decrease the swelling.

In April 2018, appointments with Drs. Arnold, Carney, and Young and Nurse Shepherd were relatively unremarkable. (ECF No. 17, pp. 522-525, 576-577, 581-583, 817-827). She exhibited a normal mental status exam and ambulated well despite some continued pain (6/10) and swelling. X-rays revealed good hardware placement. Her PICC line was pulled, although Dr. Young prescribed an additional three weeks of antibiotics.

On May 15, 2018, Dr. Arnold noted continued atrophy in the left quadriceps femoris with slightly decreased passive extension in the left knee. (ECF No. 17, pp. 811-816, 1190-1192, 1218-1220). She continued to have trouble ascending and descending stairs, exercising, and walking for long periods. Dr. Arnold advised the Plaintiff not to lift, push, or pull greater than 10 pounds, and not to kneel, squat, or climb.

Aside from some soreness after therapy, the Plaintiff's knee had improved on July 16, 2018. (ECF No. 17, pp. 805-810). Her physical exam remained unchanged, prompting Nurse Shepherd to order an FCE.

In August 2018, x-rays revealed a fracture of her fifth toe. (ECF No. 17, pp. 1048-1052, 1057). Plaintiff advised Dr. Carney that the Oxycodone was a little too much for her and wished to switch to Hydrocodone. Thus, he prescribed Augmentin and Hydrocodone. Her pain persisted and six days later, repeat x-rays showed a displaced fracture of the fifth toe that required resetting. (*Id*. at 1044-1048, 1056). Accordingly, Dr. Carney switched her back to Oxycodone.

On November 23, 2018, the Plaintiff exhibited a limited range of motion with an irregular gait. (ECF No. 17, pp. 1037-1040). Dr. Carney refilled her Oxycodone.

On November 26, 2018, Dr. Cheryl Snyder reviewed the record and concluded the Plaintiff could perform light work with limited left overhead reaching; less than moderate exposure to fumes, odors, dusts, gases, and poor ventilation; and no exposure to hazards.  (ECF No. 17, pp. 119-122).

On January 15, 2019, after Plaintiff's DLI, physical therapist, Joel Sebag completed an FCE and provided the following work limitations: no lifting waist level more than 30 pounds, lifting shoulder level more than 25 pounds, or lifting overhead more than 20 pounds; no pushing/pulling more than 35 pounds, no carrying more than 25 pounds; no squatting, crouching, kneeling, or crawling; and no prolonged standing activities or frequent walking.  He noted that she did not walk with a limp to her left lower extremity and did not require the use of an assistive device, although she exhibited mild swelling and tenderness in the left patella femoral region, tenderness to palpation to her medial joint line, and discomfort with prolonged standing or walking.  Further, PT Sebag opined she was unable to kneel on her left knee for more than 10 seconds and should not squat, crouch, kneel, crawl, or climb stairs.  (ECF No. 17, pp. 1324-1354).

On January 25, 2019, Dr. Carney noted a continued limited range of motion and irregular gait, for which he refilled the Oxycodone.  (ECF No. 17, pp. 1033-1037).

On February 5, 2019, the Plaintiff reported increased pain with movement.  (ECF No. 17, pp. 1014-1019).  Nurse Shepherd released her to return to work, noting she could walk but could not kneel and had trouble climbing stairs, getting out of her car, and walking 10 blocks.

In February 2019, Dr. Carney completed a medical source statement indicating he had treated the Plaintiff monthly for three to four years via physical therapy and analgesic medication for diagnoses of pain in the back and upper legs exacerbated by lifting, pulling, and carrying more than 20 pounds.  (ECF No. 17, pp. 1021-1025).  Objective signs and clinical findings included

10

tenderness to palpation over the lower lumbar spine. He opined that the Plaintiff could stand/walk less than two hours in an eight-hour workday and sit about four hours; needed to shift positions at will and take unscheduled breaks; could lift/carry less than 10 pounds frequently and 10 pounds occasionally; could frequently turn head right or left; could occasionally look down, look up, hold head in static position, twist, climb ladders and stairs; could rarely stoop/bend and crouch/squat; and would likely miss more than four days of work per month. Further, Dr. Carney indicated her pain would impact on her ability to concentrate and pay attention.

On May 6, 2019, Dr. Rita Albright reviewed the record and concluded the Plaintiff could perform light work with occasional climbing, balancing, kneeling, crouching, and crawling; limited overheard reaching bilaterally; and less than moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (ECF No. 17, pp. 138-142).

We note that the ability to walk into and out of an exam room for a medical appointment does not indicate that the individual can stand and walk for long periods of time. Likewise, the absence of a limp when the patient walks across the room does not mean he or she can walk for eight hours per day. This is especially true when, as here, the individual has a lengthy history of knee impairment requiring surgical correction. We also note that treating physicians do not always conduct full physical exams at each visit. They often adopt the physical findings from the previous visit. Thus, not all physical exams are equal and provide a true glimpse into the individual's physical abilities. This is why detailed physical exams, medical source statements, and FCEs are so important in social security cases.

In the present case, the statements prepared by the various examining sources clearly indicate that the Plaintiff could not climb, stoop, kneel, or crouch. These opinions are in stark contradiction to the ALJ's limitation to occasional posturals. S*ee Combs v. Berryhill*, 878 F.3d

642, 646 (8th Cir. 2017) (RFC is medical question, so it must be supported by some evidence of claimant's ability to function in workplace).  Although these assessments were completed after the Plaintiff's DLI, there is nothing in the record to suggest that her condition changed in the period between her DLI and the dates of these assessments.  Thus, the ALJ should have considered them in the RFC.  *See Martonik v. Heckler*, 773 F.2d 236, 240 (8th Cir. 1985) (holding ALJ should have consider medical evidence of a claimant's condition after the expiration of the claimant's insured status because it may bear upon the severity of the claimant's conditions before his/her DLI).  Because he failed to do so, we find that remand is necessary to allow him to reevaluate the Plaintiff's RFC during the relevant period.  *See Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016) (holding the ALJ must determine the claimant's RFC based on all the relevant medical and non-medical evidence); *see also* 20 C.F.R. § 416.945(a)(3).

## IV.     Conclusion

Based on the foregoing, it is recommended that the Commissioner's decision be reversed, and the case remanded back to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of July 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE